IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN WILLIAMS              } | |
|                            } | |
|     Plaintiff,      } | |
|                            } | |
| v.                         } | CIVIL ACTION NO. H-03-4579 |
|                            } | |
| GENIE INDUSTRIES, INC. AND } | |
| SUNBELT RENTALS INC. D/B/A } | |
| SUNBELT EQUIPMENT RENTALS, INC. } | |
|                            } | |
|     Defendant.     } | |

**OPINION ON SUMMARY JUDGMENT**

Pending before the court is the Motion of Defendants Genie Industries, Inc. (hereinafter "Genie") and Sunbelt Rentals, Inc. ("Sunbelt") for Summary Judgment. (Doc. 31) Based upon this court's review of the parties' arguments and the applicable law, the Motion is GRANTED.

**I.          Legal Standard : Summary Judgment**

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's

claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element. *Fontenot v. Upjohn,* 780 F.2d at 1195. If the moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ. P. 56(c). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R.Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine issues of fact extant in the summary judgment evidence produced by the movant, if any. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

**II.       Factual Background**

Williams' injury occurred on August 9, 2001. At the time of the incident, Williams was 59 years old, and was employed by Goodman Manufacturing, Inc. (Doc. 45, Deposition of John Williams, Exhibit A, pp. 9, 23.)

Williams worked as a maintenance man on the third shift, which was 12:00 am until 8:00 am. (*Id*. at pp. 44 - 45.) As part of his job duties as a maintenance man, Williams would drive forklifts, boom lifts, and an overhead crane. *(Id*. at 27.) The accident occurred as Williams was navigating an aerial boom lift down a loading ramp at the Goodman facility. The aerial boom lift, a Genie Model Z-34/22N, serial number 795 (hereafter "Lift"), was designed and manufactured by Defendant Genie Industries, Inc. (hereinafter "Defendant Genie"). (Doc. 45, p. 2; Exh's G, H, I.)

The Lift was part of the Defendant Sunbelt Rentals, Inc. ("Defendant Sunbelt") rental fleet. (Doc. 45, p. 2-3; Exh. D.)  Defendant Sunbelt leased the Genie Lift to Goodman for primary use by a Goodman subcontractor, and the Genie Life had been at the Goodman facility for about a month prior the incident.  (*Id*. at 42.)  The maintenance crew on the third shift, which included Plaintiff, Williams, was instructed by Goodman to use the Genie Lift for whatever jobs needed to be completed.  (*Id*. at 43.)

On the date of the incident, Williams arrived at midnight for his shift.  (*Id*. at 103.)  The previous day, Williams' boss, Mr. Greenhall, had instructed Williams to use the Genie lift to change the burned out lights on the truck loading dock on the south side of the Goodman facility.  (*Id*. at pp. 105, 111 & 115.)  The lights were on the outside of the facility in the area of the loading dock.  (*Id*. at pp. 106-108.)  In order to access the loading area, which was a flat area adjacent to the parking lot, Williams had to drive the Genie Lift down a ramp that was on the side of the loading area.  (*Id*. at pp. 107-111.)  Williams estimated in his deposition that the ramp on which the incident occurred was 30 feet long and 4 feet high at the apex, and approximately 12 feet wide.  (*Id*. at pp. 109-113, 131-32.)  The ramp had a 6" to 8" concrete "rail" on either side.  (*Id*. at p. 131.)  The ramp had two steel posts at the bottom, each filled with concrete.  (*Id*. at p. 132.)

Prior to the incident, Williams had not driven the subject Lift on any inclines.  (*Id*. at pp. 54-55, 67-68.)  Williams only drove the Lift on an incline at the time of the incident.  (*Id*. at p. 73.)  While driving the Lift down the ramp adjacent to the delivery dock, Williams alleges the brake system malfunctioned, and the Lift proceeded down the ramp uncontrollably.  (Doc. 1, First Amended Petition, ¶¶ 9 & 12.)  Williams alleges that the incident was the result of the failure of the braking system.  (Doc. 45, Plaintiff's First Amended Petition, Exhibit B.)  Williams argues that had either of these two defects not occurred, the incident would have been prevented.

As a result of the malfunctions, the Lift struck a concrete pillar at the base of the ramp.  Williams was violently thrown about the Lift basket, suffering numerous broken bones and additional soft-tissue injuries.  (Doc. 45, Exh's A, C-1, C-2, and C-3.)  Williams' medical expenses resulting from the incident exceed $100,000.  (*Id*.)

**III.        Analysis**

Defendant argue, and Williams does not oppose the argument, that Williams has abandoned his claims for design defect, marketing defect, and negligence based on defective

design, marketing and manufacturing, leaving only Williams' manufacturing defect claim. Hence, the court analyzes solely this latter claim for manufacturing defect.

Here, as in *Baldwin-Lima-Hamilton Corp. v. North Star Coal Co.*, 457 Pa. 321, 324, 319 A.2d 914 (Pa. 1974), it is alleged that the Lift was manufactured and sold with a defective braking system making the machine unreasonably dangerous to Williams, and that such defect was a producing cause of his injury. A manufacturer who places into the stream of commerce a product rendered dangerous to life and limb by reason of some defect is strictly liable in tort to one, even if they be a non-user and a non-consumer, who sustains an injury because of the defective condition. *Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex. 1969). Texas has adopted Section 402A of the Restatement (Second) of Torts providing for strict liability for the sale of dangerously defective products.[1] *See McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788-89 (Tex. 1967); *See also Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 734 (Tex. App.- Amarillo 1999, pet. denied) (applying strict liability to both manufacturers and sellers of used products)*; Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex. 1975) (finding that one is strictly liable for introducing unreasonably dangerous products into commerce whether one is a *seller* or *lessor*); *Sharp v. Chrysler Corp.*, 432 S.W.2d 131, 136 (Tex. Civ. App.- Houston [14th Dist.] 1968, writ ref'd n.r.e.) (The existence of a defect at the time possession and control is surrendered by the manufacturer or assembler must be established.).

"A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a way that renders it unreasonably dangerous." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex. 2000)). "A plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries." *Id.* (citing *Torrington*, 46 S.W.3d at 844.). A producing cause is a substantial factor

---

[1] § 402A Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
    (a) the seller is engaged in the business of selling such a product, and
    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
    (a) the seller has exercised all possible care in the preparation and sale of his product, and
    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

which brings about the injury and without which the injury would not have occurred. *C.J. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995).

"If the plaintiff has no evidence of a specific defect in the design or manufacture of the product, he may offer evidence of its malfunction as circumstantial proof of the product's defect." *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349-50 (Tex. 1977), *overruled in part on other grounds by Turner v. General Motors*, 584 S.W.2d 844, 851 (Tex. 1979). Often, it is necessary, as stated by the Court in *Darryl*, that a manufacturing defect be proven by use of circumstantial evidence:

> To exclude circumstantial evidence that the product was defective at the time of the sale would frustrate the beneficial purposes of the doctrine. It would be equally difficult, if not impossible, for the plaintiff to rebut by direct evidence all of the conceivable possibilities which would account for the defective condition other than the existence of the defect at the time of the sale. Such direct evidence should not be required, particularly when dealing with a latent defect. *Darryl*, 440 S.W.2d at 632.

Whether a defect in the product existed when it left the Defendants' hands is often a matter of inference. *See Parsons v. Ford Motor Co.*, 85 S.W.3d 323, (Tex. App.- Austin, 2002, pet. denied). "To establish a defect through circumstantial evidence, one must prove both (1) proper use of the product and (2) malfunction. *Id.* (*citing Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444-45 (Tex. 1989)). In other words, Williams may establish strict liability based upon a manufacturing defect, within the meaning of Section 402A of the Restatement (Second) of Torts, "by proving that the product functioned improperly in the absence of abnormal use and [in the absence of] reasonable secondary causes." *Greco v. Bucciconi Engineering Co.*, 407 F.2d 87, 89-90 n.3 (3rd Cir. 1969) (citing *Franks v. Nat'l Dairy Products Corp.*, 282 F. Supp. 528, 531 (W.D. Tex. 1968)). A "malfunction" may be established by testimony from the product's user about the circumstances surrounding the event in question. *Parsons*, 85 S.W.3d at 330 (citing *Ford Motor Co. v. Gonzales*, 9 S.W.3d 195, 199 (Tex. App.- San Antonio 1999, no pet.); *Sipes v. General Motors Corp.*, 946 S.W.2d 143, 155 (Tex.App.- Texarkana 1997, writ denied)). "Expert testimony is not necessarily required to establish a manufacturing defect." *Id.* (citing *Sipes*, 946 S.W.2d at 156).

Nevertheless, "[t]racing the defect in the product into the hands of the defendant or defendants is necessary, though such proof may confront the plaintiff with a heavy burden," and Williams "must have produced evidence of probative force that the braking system was defective

when it left" [Genie or Sunbelt's] possession and control." *Carroll v. Ford Motor Co.*, 462 S.W.2d 57, 61-62 (Tex. Civ. App. - Houston [14th Dist.] 1970, no writ.)  Furthermore, the Court of Appeals in Houston has warned that "[a]s a general matter cases are not to be submitted for jury consideration when there is no evidentiary foundation on which to predicate intelligent deliberation and reach a reliable verdict;" the court stated it is concerned with "what the evidence will establish as a reasonable probability." *Sharp*, 432 S.W.2d at 135; *See Insurance Company of North America v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) (discussing reasonable probabilities). "The bare fact that an accident happens to a product, that the brakes failed as in this case, is not sufficient proof that the product was defective." *Carroll*, 462 S.W.2d at 61-62. (citing *Jack Roach -Bissonet, Inc.*, 417 S.W.2d 262, 278 (Tex. 1967)).

In *Baldwin-Lima-Hamilton*, a case discussed in *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 350 (Tex. 1977), the Supreme Court of Pennsylvania reasoned that "questions when and where a defect originated should be left to the finder of fact so long as 'reasonable and well balanced minds (could) be satisfied from the evidence adduced that the defective condition existed when the machine was delivered.'" *Baldwin-Lima-Hamilton,* 457 Pa. at 334, 319 A.2d at 922 (*citing Bucciconi*, 407 F.2d at 90.). Although the plaintiff in that case had been allowed to rely upon circumstantial evidence to substantiate its allegations of a defect in a crane's brake locking mechanism, the fact that the crane had been sold by the manufacturer over 20 years prior to the accident, during which time the crane had been modified several times and subjected to 'rugged use,' made any jury's conclusion that the mechanism was defective 'no more than a guess' according to the court. *Baldwin-Lima-Hamilton*, 457 Pa. at 334-35, 319 A.2d at 922-23. The "vicissitudes of over twenty years of rugged use of the crane [made] these possible sources of the alleged defect in the locking device no less likely than an error in manufacture or design." *Id.* at 335, 319 A.2d 922. The court therein reasoned that in certain cases, the "prolonged use factor may loom so large as to obscure all others in a case," and cited Professor Prosser as stating that

> [W]hen there is no definite evidence, and it is only a matter of inference from the fact that something broke or gave way, the continued use usually prevents the inference that the thing was more probably than not defective when it was sold. *Id.* at 336 (citing Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn. L. Rev. 791, 844-45, (1966).

The court is constrained to deal with reasonable probabilities, not possibilities.

Williams has argued that the malfunctions of the Lift are the failure of the braking system to engage, and the failure of the internal speed limiting device to control the speed of the Lift on the ramp. (Doc. 45, p. 7.) Williams also argues he was properly using the Lift at the time of the accident. (Doc. 45, p. 6.) The circumstantial evidence offered for proof of defect, shows that at the time of the accident, Williams was driving down an incline that had a 13.8 - 14% gradient, and the Genie Operator's Manual states the Lift could be operated on a slope of 20%. (Doc. 45, Dirk Smith Aff., Exh. E., & Exh's G, H, I.) Prior to the incident, Williams states he had driven other Genie Lifts on other inclines, including the ramp involved in the incident, without encountering any problems. (Doc. 45, Williams Depo, Exh. A, pp. 67-71.) It was Williams' practice in driving a Genie Lift down an incline to engage the foot pedal and press forward on the drive stick, and then release the drive stick and the foot pedal simultaneously to bring the Lift to a stop; the Lift would stop within inches of the foot pedal being released. (*Id*. at pp. 68-69, 101-102.) Williams testified he used the same procedure on other Genie Lifts to come down the same ramp and perform the same tasks of changing out burned lights in such instances, and that he used the same procedure during the incident at issue. (*Id*. at pp. 72, 116-118.) Prior to the accident, Williams states he followed his normal practice and raised the basket on the lift 2 or 3 feet in order to navigate down the slope, but, after starting down the ramp, and stopping twice, the brakes failed to engage. (*Id*. at 73, 74-75, 80-81, 130, 143-159.)

Williams testified he did not experience difficulties with the Lift brakes prior to the accident; that to engage the controls of the Lift and disengage the automatic braking system one had to depress the foot pedal; and, during the accident the Lift began to roll even with the foot pedal disengaged. (Doc. 45, Williams Depo., Exh. A, pp. 58-59, 60-63, 65, 73, 146-149.) According to the affidavit of Dirk Smith, the expert witness for the Plaintiff, when the foot switch on the crane is released and control lever returned to the center, the brake should engage and the lift should stop. (Smith Aff., Exh. E.)

The Lift at issue was manufactured on May 28, 1997. (Doc. 45, Exh. G.) The Defendants therefore retort that the instant Lift was manufactured and sold by Genie approximately four years before Williams' accident. (Doc. 52, p. 2.) A "long hiatus" in the "proof of possession" of a vehicle can be fatal to a plaintiff's strict liability recovery. *Caroll*, 462 S.W.2d at 62. The Texas Supreme Court recognized, in commenting on the Restatement (Third) of Torts: Products Liability 3 (1998), that one cannot infer a product defect merely from harm without proof of a

specific product defect unless the product is new or almost new. *Ridgway*, 135 S.W.3d at 601. And, evidence that the product may have been used improperly or was altered by repair weakens any inference to be drawn from the harm. *Id*. at 602. The long, silent history of the Lift greatly weakens Williams' case.

Ruling out other causes is also important. In *Ridgway*, the court denied relief to the plaintiff because plaintiff's testimony did no more than establish that a fire had occurred, his expert did not rule out other potential causes of the fire, and there was no proof, more than a scintilla, that a defect existed in the truck at the time it left the manufacturer. *Id*. at 601. In *Nissan Motor Co., Ltd. v. Armstrong*, an 'unintended acceleration case', the Texas Supreme Court reaffirmed its reasoning, stating that in *Ridgway*,

> [A]n engine fire in an older vehicle was not evidence that the vehicle was defective; there were simply too many potential causes to assume from the one that the other must have been the culprit. Instead, we held that a specific defect must be identified by competent evidence and other possible causes must be ruled out. These requirements are especially compelling in unintended acceleration cases. Not only are there many potential causes (from floor mats to cruise control), but one of the most frequent causes (inadvertently stepping on the wrong pedal) is untraceable and unknown to the person who did it. 145 S.W.3d 131, 137 (Tex. 2004) (footnotes omitted).

Defendants correctly point out that in the instant action, as in *Ridgeway*, Williams does not rule out other potential causes such as operator error, or make any showing that the alleged defect existed in the Lift at the time it left Genie or Sunbelt. As Defendant argues in light of *Armstrong*, the occurrence of an alleged unintended machine movement is no evidence that the machine contains a manufacturing defect. Williams' expert witness, Dirk E. Smith, ("Smith") has admitted that he does not know what any defect in the brake of the Lift was, nor does ne have any idea as to why it malfunctioned. (Doc. 67. Smith Depo., Exh. A, pp. 56-57.) Furthermore, Smith had never re-tested the Lift to see if the brakes would hold the machine after driving partially down the ramp. (Doc. 31, Recommendations for Additional Work, Exh. A, ¶ 2.) Defendants point out there is no evidence that the brakes have not worked properly since the time of the accident, and that Williams had no problems with the brakes on the machine prior to the accident. (Doc. 52, p. 2.) Defendants' expert witness, Barris Evulich, avers that the Lift passed all the testing to which he subjected it and exhibited no malfunctions in braking or speed limitation. (Doc. 52, Evulich Aff.)

Of particular note, Williams' initial pleading never stated that there was a failure of the switch which limited the speed of the Lift, but rather described a situation wherein the brakes

had failed and the Lift had rolled down an incline. (Doc. 1, Plaintiff's First Amended Petition, ¶'s 9, 10, 12.) Nevertheless, the court has considered evidence regarding the speed control mechanism. Smith stated that his testing of the "Function Tests" performed on the Lift, tests 36 through 38 showed that the limit drive (or "drive limit") switches did not limit the speed of the lift to one (1) foot/second when the boom was raised one (1) foot and the drive control handle moved to the full drive position, but rather that the Lift moved at five (5) feet per second. (Doc. 31, Preliminary Observations, Exh. A, ¶ 2.) While Defendants argue that Smith did not properly test the Lift's switches (Doc. 52, p. 7), they also point out that Williams testified he was not driving the lift via the control handle or otherwise at the time of the accident, but that he had released the controls and the foot pedal yet the Lift just rolled down the ramp. (Doc. 45, Williams Depo., Exh. A, pp. 144-146, 210-211.) Smith's test involved moving the control handle to the full drive position, something Williams does not allege or testify he did.

The Lift was manufactured over four years prior to Williams' accident, and there is no explanation in the record for this interstitial time, or for the fact that no trouble with any of the Lift's braking systems was apparent either before or after the accident. Based upon precedent, this extinguishes any inference that can be drawn about the existence of reasonably probable defects in the manufacturing of the Lift. *See Ridgway*, 135 S.W.3d at 601-02; *See also Baldwin-Lima-Hamilton*, 457 Pa. at 336, 139 A.2d at 923. Williams has also not ruled out operator error; and in fact, Williams' account of the accident does not align with the description of operations provided by Williams' expert, Dirk Smith, in order to describe how the Lift moved down the slope. Williams had testified he stepped off the pedals, which action should have allegedly caused braking, and that he did not utilize the other controls, which were in "neutral," when the Lift rolled down the slope (Doc. 45, Exh. A, pp. 146-149, 155), whereas Smith described a scenario wherein the speed of the Lift was not limited, causing it to drive at five feet per second, when the "secondary boom was raised 1 foot" and the drive control handle was "moved to the full drive position." (Doc. 31, Preliminary Observations, Exh. A, ¶ 2; Doc. 45, Exh. E) Furthermore, Smith never found in his Preliminary Report (Doc. 31, Preliminary Observations, Exh. A), nor his later Affidavit (Doc. 45, Exh. E.) whether a malfunction existed in the braking system of the Lift as a result of his own testing. Smith merely stated conclusorily in his Affidavit that "[i]f Mr. Williams operated the lift as described in his deposition, then the brake system malfunctioned." (Doc. 45,

Exh. E.) Defendants' expert, Barris Evulich, found nothing wrong with the Lift's brakes or drive limit switches.

Altogether, the circumstantial evidence does not, as a matter of law create any more than a possibility, rather than a reasonable probability, that a manufacturing defect attributable to Genie, was responsible for Williams' Damages. Accordingly, it is hereby

ORDERED that the Motion of Defendants Genie Industries, Inc. (hereinafter "Genie") and Sunbelt Rentals, Inc. ("Sunbelt") for Summary Judgment. (Doc. 31) is GRANTED.

SIGNED at Houston, Texas, this 5th day of July, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE